# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| In the Matter of the Detention of<br><br>E.H. | No. 88049-7-I<br><br>DIVISION ONE<br><br>UNPUBLISHED OPINION |

BIRK, J. — In this appeal from an involuntary treatment commitment order, we are asked (1) whether substantial evidence supported the trial court's conclusion that E.H. was gravely disabled and (2) whether the court improperly considered a hearsay laboratory report—which was expert basis evidence—substantively.  Finding no error, we affirm.

I

E.H. is 63 years old and resides in Renton, Washington.  Before her commitment, E.H. was staying at her son's house.  On March 18, E.H.'s husband arrived at their son's house to bring her home, but E.H. refused.  When E.H.'s husband insisted that she leave the house, she screamed at him and threw objects at him.  After E.H. left the room, her husband followed her and she hit him with a large wooden spatula, injuring his hands.  E.H. told her husband that, if she had a knife, she would have killed him.  E.H.'s husband called their daughter-in-law, who

called 911. Police arrived at the house and later an ambulance took E.H. from the scene.

The next day, on March 19, a designated crisis responder petitioned to have E.H. involuntarily detained for 120 hours for evaluation and treatment because she presented an imminent likelihood of serious harm to herself and she was in imminent danger due to grave disability. On March 25, Fairfax Behavioral Health Hospital petitioned for a 14 day involuntary treatment order. At the 14 day hearing, Brian Hayden, a master's level clinician and licensed mental health counselor serving as a court evaluator at Fairfax, testified that the working diagnosis for E.H. was "bipolar disorder type one, currently manic." The court ordered 14 day commitment for E.H. On April 4, 2025, Fairfax petitioned to have E.H. detained for 90 days for involuntary treatment. After a two day hearing, the trial court concluded that E.H. was gravely disabled and ordered 90 day involuntary treatment at Fairfax. E.H. appeals the trial court's 90 day involuntary treatment order.

II

E.H. argues that the State presented insufficient evidence to support the trial court's conclusion that E.H. was gravely disabled. Specifically, E.H. asserts that the State did not prove E.H. manifested a severe deterioration in her routine functioning, the State did not prove that any change in E.H.'s behavior prevented her from receiving essential care, and the State did not prove that E.H.'s mental health disorder caused her behavioral issues. We disagree. The trial court's findings were supported by substantial evidence and those findings supported the court's conclusion that E.H. was gravely disabled.

2

For 90 day involuntary commitment, the petitioner bears the burden of showing that the individual meets the criteria for involuntary commitment by "clear, cogent, and convincing evidence." RCW 71.05.310; In re Det. of LaBelle, 107 Wn.2d 196, 209, 728 P.2d 138 (1986). Stated differently, "the ultimate fact in issue must be shown by evidence to be 'highly probable.' " Id. (quoting In re Interest of Pawling, 101 Wn.2d 392, 399, 679 P.2d 916 (1984)). In reviewing the trial court's involuntary commitment order we consider whether the findings of fact are supported by substantial evidence and if those findings support the court's conclusions of law. In re Det. of K.P., 32 Wn. App. 2d 214, 221, 555 P.3d 480 (2024). " 'Substantial evidence' is a quantum of evidence 'sufficient to persuade a fair-minded person of the truth of the declared premise.' " Id. (quoting In re Det. of H.N., 188 Wn. App. 744, 762, 355 P.3d 294 (2015)). In considering whether there is sufficient evidence, we review the evidence in the light most favorable to the petitioner. Id.

Involuntary commitment for behavioral health disorders "is a significant deprivation of liberty" that requires "due process of law." LaBelle, 107 Wn.2d at 201. "In general, an individual may be involuntarily committed for mental health treatment if, as a result of a mental health disorder, the individual either (1) poses a substantial risk of harm to him or herself, others, or the property of others, or (2) is gravely disabled." In re Det. of M.K., 168 Wn. App. 621, 630, 279 P.3d 897 (2012). Here, the trial court ordered E.H.'s commitment after finding her gravely disabled under prong (b). Gravely disabled prong (b) means a condition in which "a person, as a result of a behavioral health disorder . . . manifests severe

3

deterioration in routine functioning evidenced by repeated and escalating loss of cognitive or volitional control over his or her actions and is not receiving such care as is essential for his or her health or safety." RCW 71.05.020(25)(b). The legislature added prong (b) to "broaden the scope of the involuntary commitment standards in order to reach those persons in need of treatment for their mental disorders who did not fit within the existing, restrictive statutory criteria." LaBelle, 107 Wn.2d at 205-06.

## A

To support a finding of grave disability, the State must prove that the individual manifested a severe deterioration in routine functioning. Id. at 208. The evidence "must include recent proof of significant loss of cognitive or volitional control." Id. An individual may still manifest severe deterioration in routine functioning even if they have "stabilized or improved minimally." Id. at 207. "Although a pattern or history of mental illness is strong evidence, it is not the sole way to find that an individual experienced repeated and escalating loss of cognitive or volitional control." In re Det. of H.T., No. 87418-7-I, slip. op. at 11 (Wash. Ct. App. July 6, 2026), https://www.courts.wa.gov/opinions/pdf/874187%20order andopinion.pdf.

Before July 2024, E.H. had been depressed "for about seven years."[1] She had been "horribly depressed, with a lack of motivation, kind of isolating to her

---

[1] Four witnesses testified at E.H.'s 14 day commitment hearing: E.H., E.H.'s husband, E.H.'s daughter-in-law, and Hayden. The trial court did not find E.H.'s testimony to be credible, but it did find the other three witnesses credible. Because Hayden relied on evidence presented at the 14 day hearing in forming his opinions for the 90 day hearing, relevant evidence from the 14 day hearing is cited.

room." In July 2024, E.H. moved to Washington and she became more active and less depressed. E.H. was doing more housework and cooking. E.H. was shopping more. "She was engaging, she was exercising, she was getting out." Hayden testified that E.H.'s trajectory was that of a "manic episode," which progressively expanded after E.H. moved to Washington.

Two witnesses testified at the 90 day involuntary commitment hearing: Hayden, as court evaluator, and E.H.'s daughter. The court found the testimony of both credible. E.H.'s daughter testified, "[C]learly it's my mother speaking, but she speaks like a stranger." E.H.'s behavior had changed since her move to Washington. Her daughter described E.H. as "exhibiting a [sic] rapid speech, frenzied, panic[ked] attitude. Her vocal cadence is different. She shows a lot of— I mentioned aggression and oscillating between being angry and extremely weepy in the matter of seconds, which has—I would describe as atypical." Her daughter described E.H. as not being aggressive before her move to Washington, having a "[f]airly measured and slow" rate of speech, exhibiting introspection and being able to "hold a two-way conversation," smiling with her voice, and still having "a light in her." Her daughter testified that E.H. went from communicating with her approximately once a month, prior to her move, to communicating more frequently, including "a flurry" of "20 to 30 messages at a time." Since E.H.'s hospitalization, her daughter had not seen signs of improvement.

Hayden, relying on Fairfax medical records, testified that E.H. was "labile, restless, manic, and intrusive, [with] poor boundaries, easily irritable, hyperverbal." Hayden described E.H. as "delusional" and making "paranoid statements." E.H.

5

was noted as having anxiety and depression, with an unstable mood. E.H. was "restless and hyperactive." Though E.H. was able to perform her activities of daily living and presented low risk for suicide and violence, she was "very fixated on discharge, requesting to discharge frequently to all staff." Several chart notes indicated E.H. was medication compliant, though once she was medication compliant "with much encouragement." Hayden noted improvement on April 6, 2025, E.H. had no present mania symptoms, but on April 7, E.H. presented as manic, restless, labile, hyperverbal, with paranoia, delusions, and grandiosity.

In Hayden's opinion, E.H. was gravely disabled. Hayden testified that E.H. continued to show symptomatology of bipolar disorder and that she was not back to the baseline described by her family. E.H. was not yet stable on her medication.

Based on the testimony of family members, the court could conclude that E.H.'s baseline was not aggressive, with a measured and slow rate of speech, and capable of conversation and introspection. At the time of her 90 day commitment hearing, E.H. had not returned to her baseline. She was manic, restless, hyperactive, hyperverbal, delusional, paranoid, aggressive, and not yet stable on her medication. Substantial evidence supported the trial court's conclusion that E.H. showed severe deterioration in routine functioning as a result of her behavioral health disorder, working diagnosis of bipolar disorder type one.

B

To support a finding of grave disability, the State must prove that the individual "is not receiving or would not receive, if released, such care as is essential for his or her health or safety." LaBelle, 107 Wn.2d at 208. "To justify

6

commitment, such care must be shown to be *essential* to an individual's health or safety and the evidence should indicate the harmful consequences likely to follow if involuntary treatment is not ordered." Id.

Before her commitment, E.H. injured her husband by hitting him with a large wooden spatula. She cooked moldy fish for her daughter-in-law and grandson, which she had retrieved from the trash. E.H. was eating spoiled food, which may have been causing her gastrointestinal distress. Despite the insistence of family members, E.H. refused to take medication or see a mental health professional.

Her daughter testified that E.H. objected to her diagnosis, refused to believe that she was ill, and "very frankly, told me that she does not desire any treatment or medicine to—to aid in her recovery." Hayden stated that E.H. disagreed with her need for medication and showed "limited insight" into her need for mental health treatment. Asked, "If she's released from the hospital today, what harmful consequences do you foresee?" Hayden answered,

> Due to the lack of stabilization, the first concern is that she will discontinue the medication that she has been taking and that she will again decompensate and would not be able to meet her needs for health and safety and would again put herself at risk of violence towards others as well as the risks that she would put herself in due to her impulsiveness and impaired insight regarding the situations that she's in.

Substantial evidence supported the trial court's conclusion that, without 90 day involuntary commitment, E.H. would not receive the care that was essential for her health and safety. E.H. was still actively symptomatic, not yet stable on her medication, had shown little insight into her condition or need for medication, and had shown that she was a risk to others prior to her commitment.

7

III

E.H. contends that the trial court impermissibly relied on expert basis evidence as substantive evidence to support its commitment order. We disagree. Hayden's reliance on a hearsay lab report purporting to measure E.H.'s valproic acid levels was proper under ER 703 and 705 as expert basis evidence to inform his opinion whether E.H. was yet stable on her medication. The trial court admitted evidence of the lab report only as expert basis evidence and did not rely on it substantively.

Expert witnesses are permitted to base their opinions or inferences on facts or data which are "of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject," regardless of whether the facts or data are admissible in evidence. Hearsay statements are generally inadmissible unless an exception applies. In re: Dependency of A.C., 1 Wn.3d 186, 192, 525 P.3d 177 (2023). ER 705 permits experts to testify in terms of opinion or inference without disclosing the underlying facts or data, but a judge may require disclosure, or the expert may be required to disclose on cross-examination. The court may not rely on otherwise inadmissible expert basis evidence as substantive evidence. See A.C., 1 Wn.3d at 192.

The court here ruled that the lab report was not admissible as substantive evidence but that it could be admitted under ER 703. Hayden testified that the lab report suggested that, because E.H.'s Depakote level had decreased, she was not sufficiently taking her medication. Hayden testified that the lab report was "significant because it does show, kind of, the changes in [E.H.'s] behavior as well

8

as the consistency of specific symptoms here in the hospital." And this supported Hayden's observations that E.H. was "showing continued symptomatology of her behavioral health disorder" and "not back at the baseline that has been described by her family." E.H. cross-examined Hayden regarding the contents of the lab report. Later, the court questioned Hayden about the lab report and Depakote. Hayden testified that Depakote was being used as a mood stabilizer and that the hospital did not know why E.H.'s Depakote level had dropped so significantly.

While rendering its oral decision, the trial court noted that "the hospital, as we talked about, does have some questions about level of Depakote, but that's not something that the hospital understands at this point why the levels are different than what's been expected by her doctor. So there's not really any information about that." Later, the court stated, "[R]ight now, [E.H.'s] actively symptomatic, as the court described in its findings. So it is Mr. Hayden's testimony [E.H.] is not medication stable at present. She's not stabilizing on the medication, so she continues to exhibit active symptoms like mania." The court noted that E.H. was resistant to medication. E.H. argues that, taken together, these findings by the court show that it considered the lab report as substantive evidence because they are otherwise unsupported by substantial evidence in the record.

We disagree with E.H.'s interpretation of the record. In its written findings of fact, the trial court found that chart notes indicated E.H. was medication compliant. The court noted that E.H.'s medication compliance had once required "much encouragement," a finding supported by a chart note. Hayden used the lab report as basis evidence to support his expert opinion that E.H. was still

9

symptomatic and not yet medication stable. This evidence supported the trial court's finding that E.H. was still experiencing active symptoms of her behavioral health disorder. We find no error in the trial court's consideration of Hayden's testimony relying on the lab report.

Affirmed.

_Birk, J._

WE CONCUR:

_Feldman, J._          _Smith, J._